IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MagnetNotes, Ltd.,                   Case No. 3:10 CV 1311

          Plaintiff,                 MEMORANDUM OPINION
                                            AND ORDER
       -vs-
                                            JUDGE JACK ZOUHARY

Trexan Chemicals, Inc.,

          Defendant.

## INTRODUCTION

Defendant Trexan Chemicals, Inc. ("Trexan"), on Motion for Summary Judgment under Federal Civil Rule 56, contends that there is no genuine issue of material fact as to any of Plaintiff MagnetNotes, Ltd.'s ("MagnetNotes") five alleged claims -- breach of express warranty, breach of implied warranty of fitness for a particular purpose, negligent misrepresentation, breach of contract, and strict product liability in tort (a statutory negligent misrepresentation claim) (Doc. No.52). MagnetNotes opposed (Doc. No. 58) and Trexan replied (Doc. No. 67). Also pending before the Court is Trexan's Motion to Strike Affidavit of Rena Pomaville (Doc. No. 61) that MagnetNotes has opposed (Doc. No. 62).

## STATEMENT OF FACTS

MagnetNotes manufactures magnetic-coated paper products for a number of commercial uses (Doc. No. 58 at 2). The coating formula consists of ferrite and three manmade chemicals -- Escorene, Lica, and Irgastab -- which are blended into pellets by American Compounding Specialities, LLC ("ACS"). (*Id.*) After blending, the pellets are shipped to a company called Tapemark, where they are

fed through a heated hose into a slot die and squirted out in a thin ribbon onto a paper substrate, which is magnetized and rolled into large rolls, and then shipped to paper merchants. (*Id.*) In 2008, MagnetNotes originally tested the Escorene used in the blending, Ultra UL 7710 ("UL 7710"), that was supplied by Trexan to ensure there was no need to blend it with any additional products. (*Id.*) MagnetNotes used UL 7710 supplied by Trexan in their product successfully until January 2010 when the events giving rise to this lawsuit occurred.

Trexan is an authorized distributor for ExxonMobil ("Exxon") chemicals and supplies polymers for commercial use, including UL 7710, which is an ethylene vinyl acetate ("EVA") (Doc. No. 52 at 3). Exxon produced Ultra 7710 throughout the late 2000s, but discontinued production in 2010 and began producing Escorene XT0025 ("XT0025") as a replacement. (*Id.* at 4) XT0025 is an EVA with the same nominal specifications as UL 7710. (*Id.*)

On January 12, 2010, Mr. Boudouris, CEO of MagnetNotes, and Ms. Voyles, MagnetNotes office manager, were notified of the discontinuation of UL 7710 (Doc. No. 58 at 3). Mr. Nitkowski, President of Trexan, emailed Boudouris and allegedly informed him that Exxon had changed the name and the production line of the product, but that XT0025 was basically the same product and all other Trexan customers had been successfully transitioned to XT0025 (Doc. No. 55-1, Tr. 45 [email attached as Exh. # 2, Doc. 55-1 at 115]). In the email, Trexan included the XT0025 Certificate of Analysis ("COA") for MagnetNotes to compare with the specifications for UL 7710 and also offered MagnetNotes a sample of the new product to test before beginning use. (*Id.*) Seeking assurance that the formula had not been altered, Boudouris emailed Nitkowski to inquire about the change but could not get in contact with him (Doc No. 54-1, TR 30). Boudouris admits he received the COA, but did

2

not look at them. Nor does Boudouris dispute that the XT0025 specifications fell within the specification range for UL 7710. (*Id.*)

During the same time period, another Trexan representative assured Voyles that XT0025 was the same product as UL 7710 with a different name (Doc. No. 56-1, TR 12). Nitkwoski, aware of Boudouris' concern, also allegedly contacted Mr. Donie, President of ACS, but the two have differing accounts of the conversation. Donie recalled being assured by Nitkowski that there was no formulation change in the new product, and Donie was asked to assure Boudouris of this fact (Doc. No. 59 at 7–8). Nitkowski, however, recalls that he never called the products the "same" or "identical" or "exact," but that he instead suggested that Exxon intended to make a product as similar as possible to the one it was replacing, so they would behave similarly (Doc. No. 55-1, TR 42).

Without conducting any testing, MagnetNotes ordered an entire shipment of XT0025 instead of exhausting Trexan's remaining supply of UL 7710 (which would have been enough to cover about 70% of MagnetNotes' needs) (Doc. No. 52 at 5). Because MagnetNotes operates on a "just in time" production model, something MagnetNotes alleges Trexan and Nitkowski were aware of, Boudouris claims MagnetNotes choices were to either shut down production and find a laboratory to test the XT0025 or continue production based on the assurances he had allegedly been given by Nitkowski (Doc. No. 58 at 6). By ordering the shipment of XT0025, MagnetNotes chose to continue production.

Accordingly, Trexan shipped the new XT0025 product to ACS for blending around January 29, 2010. However, the new pellet mixture using XT0025 did not meet manufacturing specifications -- specifically the melt index and viscosity -- due to variance in the EVA content of the Escorene, causing it to coat inconsistently for Tapemark (Doc. No. 52 at 5–6). ASC processed the entire 55,120

3

pounds of the new product, and while some of it was of acceptable quality, much of it was unusable and worthless. (*Id.*)

MagnetNotes further alleges it was unaware that Exxon had been planning this transition since September 2009, but that Trexan *had* been aware of the impending change, prompting Notkowski to inform all his other "regular customers" of the change and supplying them with samples to test beforehand (Doc. No. 55-1, TR 6). MagnetNotes also claims it was unaware that XT0025 was an experimental grade, meaning that the specifications of the product were subject to change depending on the specific product lot, including the melt index and viscosity, and that XT0025 was biased toward a lower molecular weight than the original UL 7710, adversely affecting the chemical's melt strength. (*Id* at 13–14.).

Lastly, with respect to the contractual relationship between Trexan and MagnetNotes, the companies began their direct relationship in September 2008. Prior to that time, the companies had an indirect relationship, with Trexan supplying Escorene to MagnetNotes' compounder. During the changeover to a direct relationship in 2008, Trexan sent MagnetNotes an account setup package, including a Credit Application with Trexan's "Terms & Conditions of Sale" printed on the reverse side (Doc. No. 52 at 6). It is undisputed that MagnetNotes's office manager validly signed company CEO Boudouris' name on the Credit Application with a stamp; however, Voyles asserts there was nothing printed on the reverse side of the Credit Application (Doc. No. 58 at 8), possibly because the Credit Application was sent via fax. Accordingly, MagnetNotes disputes Trexan's arguments based on any of the terms included in the "Terms & Conditions of Sale."

Based on the foregoing allegations, MagnetNotes claims Trexan breached an express (Count I) and implied warranty (Count II) by asserting that the new Escorene product would perform as well

4

as the old one (Doc. No. 1-1 at 3–4). MagnetNotes also alleges that Trexan negligently misrepresented the new product would conform to the old product's specifications (Count III), and that Trexan breached the sales agreement (Count IV). Last, MagnetNotes claims Trexan is liable under O.R.C. § 2307.71 for strict product liability in tort based on the failure of the product to conform to representations of the product's specifications (Count V). (*Id.* at 4-6)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Civil Rule 56(a). When reviewing a motion for summary judgment, the court should consider the pleadings, related documents, evidence, and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress Co.*, 398 U.S. 144, 157 (1970). The initial burden lies on the moving party to demonstrate that there is no genuine dispute or that the adverse party cannot produce evidence to support the fact. Federal Civil Rule 56(c). After the moving party has carried this burden, the non-moving party must establish "specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 547, 586-87 (1986).

## DISCUSSION

**Economic Loss Doctrine**

Trexan first contends that there is no genuine issue of material fact with respect to all claims raised by MagnetNotes because the "economic loss doctrine" precludes the recovery of purely economic damages by buyers of products under contract if the claims are brought under a tort-theory of law. *HDM Flugservice GmbH v. Parker Hannifan Corp.*, 332 F.3d 1025, 1028 (6th Cir. 2003), (citing Steven C. Tourek et al., *Bucking the "Trend": The Uniform Commercial Code, the Economic*

*Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation*, 84 IOWA L. REV. 875, 875–76 (1999)).

In Ohio, "economic damages" include both "direct" economic losses -- the damage to the product itself -- as well as "indirect" economic losses -- the consequential losses sustained due to the breach, such as lost production or profits. *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 43 (1989). Moreover, components of a product are considered "the product" when calculating damages, so any damage done to a component is considered direct economic loss. *HDM*, 332 F.3d at 1031 (ruling that damage done to a helicopter's fuselage because of a defective landing gear was considered damage done to the "integrated product" and barred from tort-based recovery). The rationale behind the economic loss doctrine is to prevent a plaintiff from circumventing the terms of the contractual agreement by bringing an action in tort when the damages sought are the same as if the plaintiff brought the action under the contract. *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 872 (1986) ("When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.").

Here, this Court is unconvinced the economic loss doctrine applies. MagnetNotes is not attempting to circumvent the damages limited by the contract; in fact, the basic contract terms are not in dispute. Both parties agree there was an agreement, perhaps ill-advised, to ship XT0025, and Trexan performed under those basic terms. The dispute here revolves around the circumstances that led to the shipment of the new untested XT0025 material -- and how the contract applies to this shipment. The economic loss doctrine is simply inapplicable to this case.

**Trexan Challenges Each Count as a Matter of Law**

<u>Express and Implied Warranties (Counts I & II)</u>

Express warranties are defined by R.C. § 1302.26(A)(1) :

Any affirmation of fact made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

In order to determine if any statements were a basis of the bargain, a court should consider the circumstances surrounding the transaction, the reasonableness of the buyer in believing the seller, and the reliance placed on the seller's statements by the buyer. 1 A. Squillante & J. Fonsexa, THE LAW OF MODERN COMMERCIAL PRACTICES 236, § 3:40 (revised ed. 1980). Furthermore, reliance upon the representations is necessary in order for them to become part of the basis for the bargain. *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 422 (6th Cir. 1981).

An implied warranty of fitness for a particular purpose is defined by R.C. § 1302.28 where: (1) the seller is aware of the purpose for which the buyer intends to use the goods at the time of the sale, and (2) the buyer relies on the seller's expertise or judgment in selecting goods suitable for that particular purpose. In order for a plaintiff to prove a defendant breached an implied warranty, the plaintiff must prove (1) the existence of a defect; (2) the defect was present at the time the product left the hands of the manufacturer; and (3) the defect directly and proximately caused the plaintiff's injury. *See also Dugan & Meyers Const. Co., Inc. v. Worthington Pump Corp. (USA)*, 746 F.2d 1166, 1175 (6th Cir. 1984).

With respect to whether an express warranty even existed, the context in which the bargain took place is important -- specifically concerning the buyer's reliance. *See generally Burlington Ins. Co. v. Artisan Mech., Inc.*, 188 Ohio App. 3d 560 (Ohio Ct. App. 2010) (allowing a negligent

misrepresentation claim to be brought although the insured never read the insurance policy). Trexan contends that this claim should be dismissed on summary judgment because it is barred by the Terms & Conditions of Sale terms; MagnetNotes' knowledge and experience with EVA's meant it could not rely on Trexan's representations; and MagnetNotes declined Trexan's offer to test XT0025. Each of these assertions, however, is disputed and the context in which the decisions were made (e.g., was it reasonable to test) is for the trier of fact to consider.

Similarly, for the creation of an implied warranty, what representations Trexan may have made, and whether MagnetNotes relied upon those representations, based on the current record, are disputed facts to be determined at trial. Because of the nature and content of the discussions and representations of the new Escorene product alleged by MagnetNotes, reasonable minds could differ and such credibility determinations are questions for the trier of fact.

Breach of Contract (Count IV)

Breach of contract occurs "when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." *Garafalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108 (Ohio Ct. App. 1995). In the case of a buyer and seller, the purchase agreement is considered the offer with the terms and conditions serving as the basis for the contract. *Baumgold Bros., Inc. v. Allan M. Fox Co.*, 375 F. Supp. 807, 812 (N.D. Ohio 1973).

After a discussion with counsel, the parties agreed the basic terms of the contract to supply MagnetNotes the XT0025 material are not the primary dispute. Therefore, summary judgment on the breach of contract claim is proper.

8

Common Law and Statutory Negligent Misrepresentation (Counts III & V)

In order to prevail on a common-law claim of negligent misrepresentation (Count III), the defendant must have (1) supplied false information (2) for the guidance of others in their business transactions (3) causing pecuniary loss (4) while the plaintiff justifiably relied upon the information, (5) and the defendant failed to exercise reasonable care or competence in obtaining or communicating the information. *Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 4 (Ohio 1989).

Similarly, an Ohio statutory tort claim in negligent misrepresentation (Count V) can arise out of the same set of facts as a contract claim, if the tort claim is based upon a duty independent from any of the contractually-created duties. *See Pavlovich v. National City Bank*, 435 F.3d 560, 569 (6th Cir. 2006), *citing Corporex Dev. & Constr. Mgmt., Inc. v. Shook Inc.*, 106 Ohio St. 3d 412, 415 (Ohio 2005). In this case, a duty is created statutorily in R.C. § 2307.78(A)(2), which codifies the liability of suppliers for negligent misrepresentation as follows:

> (A) [A] supplier is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes, by a preponderance of the evidence, that . . . the following applies:
>
> * * *
>
> (2) The product in question did not conform, when it left the control of the supplier in question, to a representation made by that supplier, and that representation and the failure to conform to it were a proximate cause of harm for which the claimant seeks to recover compensatory damages. A supplier is subject to liability for such a representation and the failure to conform to it even though the supplier did not act fraudulently, recklessly, or negligently in making the representation.

R.C. § 2307.78(A)(1) and (2).

After a telephone conference with counsel for both parties, Plaintiff's counsel agreed that Counts III and V are duplicative negligent misrepresentation claims and therefore summary judgment

9

is granted on the common-law negligent misrepresentation claim (Count III).  Summary judgment with respect to the statutory claim is denied (Claim V).

**Summary Judgment on Counterclaim Against MagnetNotes**

Trexan moves for summary judgment on a Counterclaim, alleging the ACS received a shipment of 4,299 pounds of UL 7710 on March 12, 2010, for which MagnetNotes has not paid (Doc. No. 52 at 25).  Trexan attached an invoice for $5,115.81 to the Counterclaim (Doc. No. 23, Exhibit A).  There is no dispute that MagnetNotes received the shipment of UL 7710 and has not yet paid Trexan for it.  However, MagnetNotes contends it rejected the shipment, which remains intact for return to Trexan and that Trexan has made no attempt to recover the rejected shipment (Doc. No. 24 at 3).

Based on the record at this juncture and the parties' competing explanations regarding this shipment, a genuine question of fact exists precluding summary judgment.

**Motion to Strike the Affidavit of Ms. Rena Pomaville**

Finally, in addition to its Motion for Summary Judgment, Trexan also moved to strike the testimony of Rena Pomaville (Doc. No. 61).  Pomaville's affidavit is an attempt to demonstrate a genuine issue of material fact in opposition to Trexan's Motion for Summary Judgment; however, Trexan asserts that some or all of Pomaville's testimony is inadmissible as hearsay or is filed as a non-disclosed expert in violation of Federal Civil Rule 26 (Doc. No. 61 at 1).

Pomaville's statements are not presented as an expert witness, but rather firsthand testimony of the events she witnessed.  This information, from her personal knowledge as a lay witness, is proper under Evidence Rule 701.  *See e.g.*, *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 525–26 (6th Cir. 2004) (citing *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685–87 (5th Cir.

2003)). Because Pomaville is involved with the events of this conflict as they developed, she qualifies as a lay witness.

## CONCLUSION

The three claims remaining for trial are breach of express and implied warranties and the statutory negligent misrepresentation claim. The Motion for Summary Judgment on Trexan's Counterclaim is denied, as is the Motion to Strike the testimony of Pomaville.

IT IS SO ORDERED.

                                                           s/ *Jack Zouhary*
                                                   JACK ZOUHARY
                                                   U. S. DISTRICT JUDGE

July 22, 2010